**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

BRANDON ROWELL,

         Plaintiff,

v.

METROPOLITAN LIFE
INSURANCE COMPANY,

         Defendant.

CIVIL ACTION NO.

1:12-CV-0491-WSD-RGV

**MAGISTRATE JUDGE'S FINAL
<u>REPORT AND RECOMMENDATION</u>**

Metropolitan Life Insurance Company ("Metlife") moves for summary judgment, [Doc. 45], in this action filed by plaintiff Brandon Rowell ("Rowell" or "plaintiff"), alleging racial discrimination and harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, <u>et seq.</u>, and racial discrimination under 42 U.S.C. § 1981 ("§ 1981"), [Doc. 1 at 1, 15-18].[1] Rowell also alleges state law claims for negligence and intentional infliction of emotional

---

[1]  The listed document and page numbers in citations to the record in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF, except that citations to deposition transcripts are cited according to the transcript page number.

distress ("IIED"). [Id. at 18-20]. Rowell, proceeding *pro se*,[2] has filed a response in opposition to Metlife's motion for summary judgment, [Doc. 47], to which Metlife has replied, [Doc. 50]. For the reasons stated herein, it is **RECOMMENDED** that Metlife's motion for summary judgment, [Doc. 45], be **GRANTED**.

## I. PRELIMINARY MATTERS

Under the Local Rules, the movant for summary judgment must provide a "separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried," and the respondent must provide responses to each of the movant's numbered undisputed material facts, and absent proper refutation, the movant's facts will be deemed admitted. LR 56.1 B(1), (2), NDGa. More specifically, this Court must deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1. LR 56.1 B(2)a, NDGa. Metlife contends that Rowell's response,

---

[2] Rowell was previously represented by counsel in this action. See [Doc. 1; Doc. 19]. However, Rowell's attorneys withdrew, see [Doc. 17; Docs. 33 & 34], prior to Metlife's filing of its motion for summary judgment, [Doc. 45], and Rowell filed his response to the motion, [Doc. 47], without the representation of counsel.

[Doc. 47], to its statement of material facts, [Doc. 45-1], fails to comply with the requirements of the Local Rules.  See [Doc. 50 at 4-5].

Compliance with Local Rule 56.1 is the "only permissible way . . . to establish a genuine issue of material fact" in response to the moving party's assertion of undisputed facts.  Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008).  "The proper course in applying Local Rule 56.1 at the summary judgment stage is for a district court to disregard or ignore evidence relied on by the respondent—but not cited in its response to the movant's statement of undisputed facts—that yields facts contrary to those listed in the movant's statement."  Id.  The Court must then review the movant's statement of undisputed facts and ensure – by, "[a]t the least, . . . review[ing] all of the evidentiary materials submitted in support of the motion for summary judgment" – that the movant's statement of facts is in fact supported.  Id. at 1269 (internal marks omitted) (quoting United States v. One Piece of Real Prop., 363 F.3d 1099, 1101-02 (11th Cir. 2004)).

In this case, Rowell's response did not "directly refute the material facts set forth in [Metlife's] statement[] of material facts with specific citations to evidence, and it otherwise failed to state a valid objection to the material facts."  Williams v. Slack, 438 F. App'x 848, 850 (11th Cir. 2011) (per curiam) (unpublished).  In addition, Rowell was required to include with his responsive brief a "statement of additional

facts which [he] contends are material and present a genuine issue for trial." LR 56.1 B(2)b, NDGa. Rowell's response does not comply with this rule either, as he has included with his responsive brief a "Misstatement of Facts," [Doc. 47 at 1-3], which contains a series of comments that do not create any genuine issues for trial.

The Court has reviewed the evidentiary material submitted by Metlife in support of its statement of undisputed facts to ensure that those facts are supported by the record, see Reese, 527 F.3d at 1269, and each of Metlife's undisputed material facts, [Doc. 45-1], are properly supported. Accordingly, even though Rowell is proceeding *pro se*, since he has failed to submit a proper response to Metlife's statement of undisputed material facts, [Doc. 45-1], those facts must be deemed admitted. See Dinkins v. Leavitt, Civil Action File No. 1:07-CV-486-TWT, 2008 WL 447503, at *3 & n.4 (N.D. Ga. Feb. 13, 2008), adopted at *1 (declining to consider *pro se* plaintiff's response and additional statement of facts where plaintiff completely failed to follow the Local Rules); Hooks v. Bank of Am., Civil Action No. 1:04-CV-2215-CC, 2005 WL 6074915, at *3-4 (N.D. Ga. Oct. 6, 2005), adopted at *2 (citations omitted) (noting that "although the Court will liberally construe pro se pleadings, *pro se* litigants are still required to conform to the procedural rules"); Brandon v. Lockheed Martin Aeronautical Sys., 393 F. Supp. 2d 1341, 1348 (N.D. Ga. 2005), adopted at 1345 (holding *pro se* litigant to the procedural requirements of

Local Rule 56.1); <u>see also</u> <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1302-03 (11th Cir. 2009) (affirming the district court's decision to deem movant's statement of facts admitted where non-movant failed to include individually numbered, concise, non-argumentative responses corresponding to each of the movant's enumerated material facts).   In fact, while "[t]his court recognizes [plaintiff's] *pro se* status[,] . . . . plaintiff['s] *pro se* status does not excuse [him] from compliance with applicable procedural rules, including the Rule 56 requirement for non-moving parties." <u>Miller v. Eagle Tug Boat Cos.</u>, Civil Action No. 09-00401-CG-B, 2010 WL 4269156, at *6 (S.D. Ala. Oct. 25, 2010) (citations omitted); <u>see also</u> <u>McMahon v. Cleveland Clinic Found. Police Dep't</u>, 455 F. App'x 874, 877 (11th Cir. 2011) (per curiam) (unpublished) (citations and internal marks omitted) ("Although we construe pleadings filed by *pro se* parties liberally, this does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action."); <u>Galloway v. GA Tech. Auth.</u>, 182 F. App'x 877, 883 (11th Cir. 2006) (per curiam) (unpublished) (alteration in original) (citations and internal marks omitted) ("Although *[p]ro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and are liberally construed, *pro se* litigants still must comply with the procedural rules governing the proper form of pleadings."). Accordingly, the factual statements contained in Metlife's statement of undisputed material facts,

[Doc. 45-1], are deemed admitted.  Nevertheless, the facts will be construed in the light most favorable to plaintiff as required on a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam).[3]

## II.  FACTUAL BACKGROUND

In 2002, Rowell began employment with Metlife in Ohio as a sales representative in Metlife's Employee Benefits Sales Group, [Doc. 48 (Pl.'s Dep.) at 263]; Doc. 45-4 (Tate-Gowins Decl.) at 1 ¶ 3], which sells group life, dental, and disability insurance plans to employers, [Doc. 45-2 (Trinkwon Decl.) at 1 ¶ 3]. Several years later, Rowell was promoted to the position of Account Executive,[4] [Doc. 48 at 264]; see also [Doc. 45-4 at 1 ¶ 3], and subsequently sought to be transferred, for personal reasons, to Metlife's Atlanta, Georgia office, [Doc. 48 at 35, 265-66; Doc. 45-4 at 1 ¶ 4].  In the summer of 2008, Rowell accepted a transfer to

_____

[3] In any event, even if the allegations contained in plaintiff's response, [Doc. 47], were accepted as true, summary judgment would still be warranted in favor of Metlife, as none of Rowell's allegations present a "substantial conflict in evidence," Coar v. Pemco Aeroplex, Inc., 372 F. App'x 1, 2 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted), sufficient to enable a reasonable jury to return a verdict in his favor, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[4] Account Executives are charged with marketing and selling employee benefit plans to new customers.  [Doc. 48 at 160, 265; Doc. 45-2 at 1 ¶ 4].

Metlife's Atlanta office as a Client Executive,[5] where he was responsible for managing Metlife's accounts with employers having 500 to 15,000 employees. [Doc. 45-4 at 1-2 ¶¶ 4-5; Doc. 48 at 265-68]; see also [Doc. 48-11]. Rowell was guaranteed a salary of $145,000.00 for his first year in Atlanta, after which he was to receive an annual base salary of $65,000.00 plus commissions. [Doc. 48-11 at 1; Doc. 49 (Pl.'s Dep.) at 391-92].[6]

Following his transfer, Rowell's supervisor was Jeff Trinkwon ("Trinkwon"), Director of Mid-Large Markets. [Doc. 45-2 at 1 ¶ 2, 2 ¶ 6]. Trinkwon was responsible for establishing sales objectives for Account Executives and Client Executives under his supervision. [Id. at 2 ¶ 5]. In late 2008, Trinkwon set Rowell's 2009 sales goal at $6,494,853.00. [Id. at 2 ¶ 8; Doc. 45-4 at 2 ¶ 6; Doc. 48 at 182-83]. Rowell's actual sales for 2009, however, totaled $689,565.00, only 10.6 percent of his annual sales objective. [Doc. 45-2 at 2 ¶ 8; Doc. 45-4 at 2 ¶ 6; Doc. 48 at 182, 184]. At the same time, Metlife incurred more than $3,000,000.00 in losses resulting from cancellations of existing plans by customers assigned to Rowell. [Doc. 45-2 at 2 ¶ 9; Doc. 45-4 at 2 ¶ 7]. Additionally, Metlife received several customer complaints

---

[5] Client Executives manage existing client relationships by, among other things, renewing employee benefit plans upon expiration and selling existing clients additional products or services. [Doc. 45-2 at 1-2 ¶ 4; Doc. 48 at 267].

[6] Rowell's first-year salary of $145,000.00 was based on his previous earnings, inclusive of commission, as an Account Executive in Ohio. [Doc. 49 at 392].

regarding Rowell's performance as a Client Executive, and he received negative feedback on Metlife's National Service Center ("NSC") surveys, which are used to evaluate clients' satisfaction with their Client or Account Executive; some clients specifically requested not to work with Rowell any longer, and complained in particular of his lack of product and service knowledge, his deficient listening and organizational skills, and his difficulty in managing internal relationships and working effectively with his brokers.[7]  [Doc. 48-9 at 5-6; Doc. 48-20 at 3-5; Doc. 48 at 185-86, 307-08; Doc. 45-4 at 2 ¶¶ 10-11; Doc. 45-2 at 2-3 ¶¶ 11-13].

Rowell's sales during 2009 were markedly lower than those of his peers, Ed Ryan ("Ryan") and Zachary Vietri ("Vietri"), who worked with plaintiff on the same team.[8]   In July of 2009, Trinkwon offered Rowell several additional sales opportunities, which he declined.[9]  [Doc. 45-2 at 2 ¶ 10]; see also [Doc. 48 at 148; Doc. 48-2 at 3].  On September 1, 2009, Rowell took a leave of absence to have surgery on his knees, and returned to work on January 4, 2010.  [Doc. 48 at 288-89].  Upon

---

[7] One customer remarked that Rowell's position as Client Executive was "not the right role for [him]."  [Doc. 45-2 at 3 ¶ 12; Doc. 45-4 at 3 ¶ 11].

[8] In 2009, Ryan made $4,943,371.00 in sales and Vietri made $1,339,500.00 in sales, achieving 64.8 percent and 29.8 percent of their annual sales objectives, respectively.  [Doc. 45-4 at 2 ¶ 8].

[9] Rowell testified that he "was forced to" decline these opportunities, which were "more [] than [he] could handle physically," due to an injury to his knees. [Doc. 49 at 401; Doc. 48 at 149-50, 278-79].

Rowell's return, and in light of his substandard performance as a Client Executive during the previous year, Trinkwon transferred him to the position of Account Executive, where Rowell would focus on finding new clients, rather than managing existing relationships.   [Id. at 229; Doc. 45-4 at 3 ¶ 12; Doc. 45-2 at 3 ¶¶ 14-15]. Trinkwon further provided Rowell with additional opportunities and new client assignments, and set his 2010 sales goal at $4,421,477.00, based on Trinkwon's analysis of prior sales history in the sales-territory.  [Doc. 48 at 183, 294; Doc. 45-2 at 3 ¶ 17; Doc. 45-4 at 3 ¶ 13].

As an Account Executive, Rowell was expected to reach a sizeable percentage of his annual sales objective within the first quarter of the year, but he had achieved only $262,100.00 in sales, or 6 percent of his annual sales objective by February of 2010.  [Doc. 48 at 183-184; Doc. 45-4 at 3 ¶ 13; Doc. 45-2 at 4 ¶ 19].  As in 2009, Rowell's 2010 sales were substantially lower than those of his peers.[10]  On February 23, 2010, Trinkown placed Rowell on a Performance Improvement Plan ("PIP"), which set various goals for him to meet in the coming year and included guidelines

---

[10] By February of 2010, Account Executive Vietri had $2,032,365.00 in sales, which accounted for 33.5 percent of his goal; and Account Executive Katie Leweling ("Leweling"), who was hired in December of 2009, had already accomplished $962,720.00 in sales, or 47.9 percent of her 2010 sales goal.  [Doc. 45-4 at 2 ¶ 8, 3-4 ¶¶ 14-15].

for his sales activity designed to facilitate Rowell's achievement of those goals. [Doc. 45-2 at 4 ¶ 20; Doc. 45-4 at 4 ¶ 16; Doc. 48-21 at 3-6; Doc. 48-9 at 1-4].

Rowell testified that, upon his return to work in January of 2010, his coworkers "looked at him differently" because Trinkwon had purportedly informed them that clients had complained about his performance, [Doc. 48 at 210-12, 255-57], though Rowell also testified that he was not the subject of any disparaging racial comments, slurs, or insults, and that there was nothing about his work environment that was racially demeaning, [id. at 215, 257]. Rowell submitted his resignation to Metlife on July 16, 2010, effective July 30, 2010, [id. at 129; Doc. 45-4 at 17], and testified that he resigned in order to start his own insurance agency, [Doc. 49 at 373-74, 379, 482-83].[11]

In January of 2010, prior to his resignation, Rowell submitted a written questionnaire to the Equal Employment Opportunity Commission ("EEOC"), which he had previously provided to Metlife, and in which he alleged that Metlife had discriminated against him on the basis of race. [Doc. 48 at 20-21; Doc. 48-1]. In addition, sometime after his initial complaint with the EEOC, but before April of 2010, Rowell filed an internal complaint with Metlife, alleging racial discrimination with respect to his employment. [Doc. 48 at 22-23]. On April 15, 2010, Rowell filed

---

[11] Rowell resigned several months before his completion of the goals established in his PIP were due to be completed. See [Doc. 48 at 250-52].

a charge of racial discrimination with the EEOC, in which he alleged that Metlife discriminated against him by not affording him the same opportunities for compensation as his peers and by placing him on the PIP.[12]  [ Doc. 48-3].   On November 18, 2011, the EEOC closed its file on Rowell's charge, citing inconclusive evidence of discrimination, and issued him a notice of dismissal and right to sue. [Doc. 48-6; Doc. 48 at 40; Doc. 49 at 335].   On February 16, 2012, Rowell filed the instant action, alleging, among other things, racial discrimination in violation of Title VII and § 1981.  [Doc. 1].

### III.  SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court views all evidence in the light most favorable to and draws all reasonable inferences in the favor of the non-moving party.  Gray v. City of Jacksonville, Fla., 492 F. App'x 1, 3 (11th Cir. 2012) (per curiam) (unpublished) (citations omitted).  "Summary judgment shall be granted if the movant shows that there is 'no genuine issue as to any material fact', such that the movant is entitled to judgment as a matter of law."  Jerome v. Barcelo Crestline, Inc., 507 F. App'x 861, 863 (11th Cir. 2013) (per curiam) (unpublished) (quoting Fed. R. Civ. P. 56(a)); see also Holmes v. Ga. ex rel. Strickland, 503 F. App'x

---

[12] In Rowell's initial EEOC complaint, he had also alleged that Metlife's discriminatory actions included "threatened termination," and "comments made." [Doc. 48 at 12; Doc. 48-1 at 2].

870, 872-73 (11th Cir. 2013) (per curiam) (unpublished) (citations omitted); Young v. FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material facts, upon which the non-moving party must then submit specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Premier Assocs., Inc. v. EXL Polymers, Inc., No. 1:08-cv-3490-WSD, 2010 WL 2838497, at *8 (N.D. Ga. July 19, 2010) (citations omitted). "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation[s] or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Jackson v. B & L Disposal, Inc., 425 F. App'x 819, 820 (11th Cir. 2011) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted); see also Shuler v. Ingram & Assocs., 441 F. App'x 712, 715 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted); Bryant v. U.S. Steel Corp., 428 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). "Speculation or conjecture cannot create a genuine issue of material fact." Shuler, 441 F. App'x at 715 (citation omitted); see also Howard v. Or. Television, Inc., 276 F. App'x 940, 941 (11th Cir. 2008) (per curiam)

(unpublished) (citation omitted); <u>Goodman v. Ga. Sw.</u>, 147 F. App'x 888, 891 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted) ("All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable."). "Moreover, the non-moving party cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.'" <u>Morales v. Ga. Dep't of Human Res.</u>, 446 F. App'x 179, 181 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," <u>Anyanwu v. Brumos Motor Cars, Inc.</u>, 496 F. App'x 943, 945-46 (11th Cir. 2012) (per curiam) (unpublished) (citation and internal marks omitted), and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper," <u>Premier Assocs., Inc.</u>, 2010 WL 2838497, at *9 (alteration in original) (citation and internal marks omitted).

## IV.  DISCUSSION

### A.    Racial Discrimination Claims

Rowell asserts that Metlife discriminated against him by intentionally treating him less favorably than similarly situated non-African-American employees, because Metlife did not afford him the same opportunities that were offered to his

Caucasian co-workers, and subjected him to a "false PIP" that was pretextually based on Rowell's failure to achieve an unrealistic and unattainable sales goal. [Doc. 1 at 15-17 ¶¶ 26-31, 18 ¶¶ 35-37]; see also [id. at 1-3]. Metlife argues that Rowell's discrimination claims fail as a matter of law because he has not established that he suffered any adverse employment actions and even if he could make a prima facie case, he has offered no evidence that Metlife's legitimate, non-discriminatory reasons for taking any of these actions is pretext for discrimination. [Doc. 45-5 at 2, 6-15].

Title VII makes it unlawful for a covered employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The elements of a claim of race discrimination under 42 U.S.C. § 1981 are the same as a Title VII disparate treatment claim in the employment context." Gaston v. Home Depot USA, Inc., 129 F. Supp. 2d 1355, 1367 (S.D. Fla. 2001) (citation omitted). Thus, the Court will consider Rowell's Title VII discrimination claim in conjunction with his § 1981 claim. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes have the same requirements of proof and use the same analytical framework[.]").

Where, as here, there is no direct evidence of discrimination, the Court evaluates claims of racial discrimination by using the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Maddox-Jones v. Bd. of Regents of Univ. Sys. of Ga.</u>, 448 F. App'x 17, 19 (11th Cir. 2011) (per curiam) (unpublished); <u>see also</u> <u>Miller-Goodwin v. City of Panama City Beach, Fla.</u>, 385 F. App'x 966, 969 (11th Cir. 2010) (per curiam) (unpublished); <u>Coar</u>, 372 F. App'x at 3.  Plaintiff must first establish a prima facie case.  <u>Berman v. Orkin Exterminating Co.</u>, 160 F.3d 697, 701 (11th Cir. 1998); <u>Xu v. Bd. of Trs. of the Univ. of Fla.</u>, 833 F. Supp. 2d 1338, 1345 (N.D. Fla. 2011).  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam) (citations omitted); <u>see also</u> <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253-54 (1981).

If Rowell establishes a prima facie case, an inference of discrimination arises, and the burden then shifts to Metlife to articulate legitimate, non-discriminatory reasons for its actions.  <u>Berman</u>, 160 F.3d at 702; <u>see also</u> <u>Entrekin v. City of Panama City Fla.</u>, 376 F. App'x 987, 997 (11th Cir. 2010) (per curiam) (unpublished); <u>Batts v. Silver Line Bldg. Prods. Corp.</u>, Civil Action File No. 1:08-CV-3355-WSD-ECS, 2010 WL 966860, at *9 (N.D. Ga. Feb. 22, 2010), adopted by 2010 WL 966861, at *2 (N.D.

Ga. Mar. 12, 2010).  Metlife's burden, one of production and not of persuasion, is "exceedingly light." Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988); see also Bagwell v. Peachtree Doors & Windows, Inc., Civil Action File No. 2:08–CV–191–RWS–SSC, 2011 WL 1497831, at *21 (N.D. Ga. Feb. 8, 2011) (citation omitted), adopted by 2011 WL 1497658, at *1 (N.D. Ga. Apr. 19, 2011).  "It is not necessary that the court believe the evidence [proffered by the employer]" as "the court's analysis can involve no credibility assessment." Matthews v. City of Dothan, No. 1:04–CV–640–WKW, 2006 WL 3742237, at *5 (M.D. Ala. Dec. 18, 2006) (citation and internal marks omitted).  Rather, "[s]o long as the employer articulates 'a clear and reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 770 (11th Cir. 2005) (per curiam) (citation omitted).

If Metlife meets its burden of production with respect to each of Rowell's claims, the inference of discrimination is erased, and the burden shifts back to Rowell to show that Metlife's articulated reason is merely a pretext for discrimination.  Entrekin, 376 F. App'x at 997; see also Saunders v. Emory Healthcare, Inc., 360 F. App'x 110, 113, 115 (11th Cir. 2010) (per curiam) (unpublished); Carroll v. Tavern Corp., Civil Action File Nos. 1:08–CV–2514–TWT–JFK, 1:08–CV–2554–TWT–JFK, 2011 WL 1102698, at *18 (N.D.

Ga. Feb. 9, 2011), adopted by 2011 WL 1044609, at *1 (N.D. Ga. Mar. 23, 2011). That is, "[o]nce the employer proffers a legitimate, non-discriminatory reason, in order to survive summary judgment, [plaintiff] must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of [Metlife's] articulated reasons [are] pretextual." Dockery v. Nicholson, 170 F. App'x 63, 66 (11th Cir. 2006) (per curiam) (unpublished) (last alteration in original) (citation and internal marks omitted); Bagwell, 2011 WL 1497831, at *25. Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the employer intentionally [discriminated] against the plaintiff remains at all times with the plaintiff." See Burdine, 450 U.S. at 253 (citations omitted).

1.  **Prima Facie Case Regarding Discrimination Claims**

To establish a prima facie case of race discrimination, Rowell must demonstrate that (1) he is a member of a protected class; (2) he was qualified for the job or job benefit at issue; (3) he was subjected to an adverse job action; and (4) his employer treated similarly situated employees outside of his class more favorably. Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 n.2 (11th Cir. 2006) (per curiam); Rice-Lamar v. City of Ft. Lauderdale, Fla., 232 F.3d 836, 842-43 (11th Cir. 2000).

### a.   *Adverse Action*

Rowell alleges that Metlife discriminated against him by giving him assignments with no real sales potential or opportunities and by placing him on a pretextual PIP, based on Rowell's failure to achieve sales goals that were unattainable in light of his "unproductive" assignments.  [Doc. 1 at 15-16 ¶¶ 27-31].  Metlife argues that Rowell has failed to establish that he suffered any adverse employment action.  [Doc. 45-5 at 7-8, 12-14].  Specifically, Metlife contends that being placed on a PIP does not, as a matter of law, constitute an adverse action, and that, as a result, any actions taken by Metlife leading up to its issuance of the PIP similarly cannot serve as an adverse employment action.  [Id.].

Whether a plaintiff has suffered an adverse employment action is determined on a case-by-case basis, Hanley v. Sports Auth., 143 F. Supp. 2d 1351, 1356 (S.D. Fla. 2000) (citing Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000), abrogated on other grounds as recognized by Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008)), and "not all conduct by an employer negatively affecting an employee constitutes adverse employment action," Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001) (citations omitted).  Rather, only that conduct which satisfies a "threshold level of substantiality," by "impact[ing] the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way," is

actionable under Title VII.  Id. at 1238, 1239 (citations and internal marks omitted).  Accordingly, "to prove adverse employment action in a case under Title VII's anti-discrimination clause, [plaintiff] must show a *serious and material* change in the terms, conditions, or privileges of employment."  Id. at 1239.  Furthermore, "the employee's subjective view of the significance and adversity of the employer's action is not controlling;" instead, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  Id. at 1239-40 (citing Doe v. Dekalb Cnty. Sch. Dist., 145 F.3d 1441, 1453 (11th Cir. 1998)).

Rowell has not shown that the actions taken by Metlife meet the "threshold of substantiality" necessary to satisfy the adverse employment action element of a prima facie case.  The PIP which Metlife issued to Rowell was premised on Metlife's negative evaluation of Rowell's "substandard levels of [job] performance." [Doc. 48-21 at 3].  However, only "rarely" may "a [race] discrimination claim . . . be predicated merely on [an] employer's allegedly unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment."  Davis, 245 F.3d at 1242; see id. at 1241-42 (citing cases holding that negative performance evaluations, employer-criticism, and counseling memoranda, do not constitute actionable adverse actions).  Indeed, "[e]mployer criticism, like employer praise, is an ordinary and appropriate

feature of the workplace," and "[f]ederal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee." Id. at 1242.

Rowell has not produced any evidence showing that his placement on the PIP had a "serious and material" adverse impact on his employment; Rowell was not fired or demoted, and did not take any cut in pay as a result of the PIP.  In fact, Rowell testified that, notwithstanding the PIP and any other actions taken by Metlife, his base salary remained unchanged, and he continued to receive commissions at the same rate throughout his employment with Metlife in Atlanta. [Doc. 48 at 163-64].  Accordingly, the record evidence shows that Metlife's issuance of the PIP did not materially affect the terms and conditions of Rowell's employment, and thus, his placement on the PIP did not rise to the level of an adverse action.  See Johnson v. Gwinnet Cnty. Sch. Dist., Civil Action No. 1:11-CV-00471-TWT-RGV, 2012 WL 5987584, at *10 (N.D. Ga. Oct. 17, 2012), adopted by 2012 WL 5987581, at *1 (N.D. Ga. Nov. 28, 2012) (finding no adverse employment action in race discrimination case where plaintiff received negative performance evaluations, was placed on PDP [professional development plan], and was ignored by supervisor); see also Kelly v. Mills, 677 F. Supp. 2d 206, 222 (D.D.C. 2010) (citations omitted) (holding that neither poor performance evaluations nor

placement onto a PIP constituted adverse employment actions); Smith v. CA, Inc.,
No. 8:07–cv–78–T–30TBM, 2008 WL 5427776, at *7 (M.D.Fla. Dec. 30, 2008) (holding
that placement onto a PIP was not an adverse employment action because it merely
required plaintiff to improve his performance to comply with previously established
expectations); Brown v. Sybase, Inc., 287 F. Supp. 2d 1330, 1342 (S.D. Fla. 2003)
(relying on the fact that the PIP did not impose any tangible harm on plaintiff to find
that it was not an adverse action).

Rowell maintains that he experienced an adverse employment action when
he received racially discriminatory job assignments following his transfer to
Metlife's Atlanta office.   [Doc. 48 at 14-19; Doc. 1 at 10-12 ¶¶ 15-17].   Rowell
specifically points to  three such assignments that he alleges were "based on race,"
[Doc. 48 at 14]: his assignment to recruit future Metlife employees from Morehouse
College; his assignment to work with Atlanta Life, an African-American-owned
insurance company; and his assignment to work with African-American insurance
consultant Charles Atkinson of Benalytics Consulting, [id. at 14-19, 74-77, 82, 85-86];
see also [Doc. 47 at 3 (plaintiff asserting that the "[a]ssignments of Benalytics
consulting, Atlanta Life Financial Group, and Morehouse College are all African
American institutions and assigned to [p]laintiff based on []his race.")].   Rowell
asserts that his assignments to these "traditionally African-American accounts"

lacked any "real sales potential or opportunities," and that, as a result, he was "excluded from key contacts and accounts from which [he] would have obtained . . . compensation . . ., career advancement and networking opportunities[.]"  [Doc. 1 at 15-17 ¶¶ 27-28].[13]

The Eleventh Circuit has observed that "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks," since "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise [by] challeng[ing] an employer's ability to allocate its assets in response to shifting and competing market priorities." Davis, 245 F.3d at 1244. See also Elrod v. Sears Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (citation omitted) ("Federal courts do not 'sit as a super-personnel department that reexamines an entity's business decisions[.]'"); Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) ("[F]ederal courts do not sit to second-guess the business judgment of employers.").

---

[13] But see [Doc. 49 at 351-52 (Rowell responding negatively when asked whether he was alleging that the assignment of accounts to him was racially discriminatory upon his transfer to the Atlanta office); Doc. 48 at 201 (Rowell conceding that he has no facts to support his allegation that Trinkwon gave him his assignments based on race)].

Rowell has failed to present evidence that the work assignments he received at Metlife's Atlanta office, considered both individually and as a whole, effected a material disadvantage in the terms or conditions of his employment.[14]  See Davis, 245 F.3d at 1239 (citation omitted) ("'Changes in duties or working conditions that cause no materially significant disadvantage' are not actionable[.]").  None of the work assignments cited by Rowell resulted in his termination or demotion, nor altered in any way his base salary or employee benefits.  [Doc. 48 at 163-64].  See Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (citations omitted) (noting that "changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes.").  In fact, Rowell voluntarily resigned from Metlife in order to start his own insurance agency.  [Doc. 49 at 373-74, 379, 482-83]. Consequently, Rowell's bare allegation that he was given assignments "based on race," is simply not sufficient to create "a substantial conflict in evidence to support

_____

[14] Particularly unconvincing is Rowell's argument that his assignment to recruit from Morehouse College was an act of racial discrimination since adverse action requires a "serious and material change" in employment conditions, and Rowell testified that he previously held the identical assignment to Morehouse College prior to his transfer to Atlanta, while he was still an Account Executive with Metlife in Ohio.  [Doc. 48 at 74-76, 232].  It thus appears that with regard to this particular assignment, Rowell has not only failed to establish a "change for the worse," see Elson v. Colo. Mental Health Inst. at Pueblo, Civil Action No. 09-cv-01375-MSK-CBS, 2011 WL 1103169, at *6 (D. Colo. Mar. 24, 2011) (citing Hillig v. Rumsfeld, 381 F.3d 1028, 1031 (10th Cir. 2004)), but even any change at all.

a jury question" on the issue of whether he suffered an adverse employment action.

See Coar, 372 F. App'x at 2 (citation omitted).  See also Beltrami v. Special Counsel, Inc., Civil Action No. 1:02-CV-2505-WBH-AJB, 2005 WL 6075365, at *5, n.6 (N.D. Ga. Feb. 11, 2005), adopted by 2005 WL 6075366, at *1 (N.D. Ga. Mar. 17, 2005)  (citations and internal marks omitted) ("The unsupported, self-serving statements of the party opposing summary judgment are insufficient to avoid summary judgment."); Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (citations and internal marks omitted) ("Speculation does not create a *genuine* issue of fact[.]").  Indeed, Rowell admits that the "allotment of [his sales] goal was calculated fairly," though he alleges that "the resources necessary to achieve it weren't available."  [Doc. 47 at 6-7].  Furthermore, to the extent Rowell's assignments did not afford him the sales potential and opportunities he desired, it is undisputed that Trinkwon offered Rowell additional sales opportunities which he voluntarily declined.  [Doc. 45-2 at 2 ¶ 10]; see also [Doc. 48 at 148; Doc. 48-2 at 3].[15]

Because Rowell has not shown that he suffered any adverse action, he has failed to establish a prima facie case of race discrimination, and summary judgment for Metlife is therefore warranted.  See Turlington v. Atlanta Gas Light Co., 135 F.3d

---

[15] Rowell also testified to his belief that, while "race played a part" in Trinkwon's assignment of allegedly less productive accounts to him, "the other part" that motivated Trinkwon was Rowell's own  refusal to accept the additional opportunities previously offered him.  [Doc. 48 at 175-76].

1428, 1432-33 (11th Cir.1998) (citations omitted) ("Although a plaintiff's burden in proving a *prima facie* case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a *prima facie* case."); Davis, 245 F.3d at 1246 (footnote and citation omitted) ("Because adverse employment action is an indispensable element of a Title VII plaintiff's case, [plaintiff's] failure to present sufficient evidence for a reasonable jury to find that this element was met is fatal to his case.").[16]

  **b.**   ***Similarly Situated Comparator***

  Metlife's motion for summary judgment is also due to be granted because Rowell has not satisfied the fourth element for a prima facie case of race discrimination, as he has not shown that Metlife "treated him less favorably than a similarly situated individual outside of his protected class." Edmond v. Univ. of Miami, 441 F. App'x 721, 724 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). "In evaluating the 'similarly situated' component in cases involving allegedly . . . preferential treatment, the 'quantity and quality' of the comparator's

---

[16] To the extent Rowell argues that his job assignments adversely affected his commission, see Ramirez v. Olympic Health Mgmt. Sys., Inc., 610 F. Supp. 2d 1266, 1280-81 (E.D. Wash. 2009) (finding lost sales opportunities as a result of inequitable lead distribution constitutes an adverse employment action where expert testified about the tangible sales plaintiff lost), the Court need not address this argument because Rowell's race discrimination claim fails as a matter of law for reasons in addition to and independent of the adverse action element of a prima facie case, see discussion, supra at 25-41.

circumstances must be 'nearly identical' to those of the plaintiff."[17]   Walach v. Shineski, No. 11–80412–CIV, 2012 WL 664277, at *3 (S.D. Fla. Feb. 28, 2012) (citations omitted); see also Vega v. Invsco Grp., Ltd., 432 F. App'x 867, 870 (11th Cir. 2011) (per curiam) (unpublished).  The preferentially treated "employees outside of a plaintiff's protected class who are identified as comparators must be similarly situated in all relevant respects."  Phillips v. Aaron Rents, Inc., 262 F. App'x 202, 208 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."  Id. at 1277  (alteration and internal marks omitted) (quoting Holifield, 115 F.3d at 1562).

Rowell alleges that he "was subjected to . . . disparate treatment by [Metlife] . . . when compared with [Metlife's] treatment of [p]laintiff's Caucasian co-workers," [Doc. 1 at 3], and that "Metlife intentionally treated [plaintiff] . . . less favorably than similarly situated non-African-American employees on the basis of race by

---

[17] Some panels of the Eleventh Circuit have required only a showing of "similar" conduct, see e.g., Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1989), as opposed to "nearly identical" conduct, see e.g., Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citation omitted); see Maynard v. Bd. of Regents of Univs. of Fla. Dep't of Educ., 342 F.3d 1281, 1290 (11th Cir. 2003).  However, under the prior panel rule, the "nearly identical" standard remains binding.  Burke-Fowler, 447 F.3d at 1323 n. 2; see also Floyd v. Fed. Express Corp., 423 F. App'x 924, 930 n.6 (11th Cir. 2011) (per curiam) (unpublished); Howard, 276 F. App'x at 942; Buford v. City of Atlanta, Ga., Civil Action File No. 1:06-CV-3089-TWT, 2008 WL 552933, at *6 (N.D. Ga. Feb. 26, 2008), adopted at *1.

preventing him from receiving employment opportunities that were offered to non-African-American co-workers," [id. at 15-16 ¶ 27]; see also [Doc. 48 at 35].  Rowell identifies the following Caucasian employees whom he claims received more favorable treatment than him: Ryan, Vietri, Leweling, and Brian Blackburn ("Blackburn").[18] [Doc. 48 at 58-60].  Rowell alleges that these individuals were given more favorable opportunities because more brokers, consultants, and clients were

---

[18] Blackburn was an "established sales rep" with "15 some odd years of experience." [Doc. 48 at 100].  Moreover, he was a "a very high-selling rep and had been for several years" before Rowell became an Account Executive in Atlanta in January of 2010. [Id.].  Indeed, Rowell admits that Blackburn was the highest selling sales representative in Atlanta, and concedes that one "could make a case" that Blackburn deserved any additional opportunities he received based on his success. [Id. at 101-02].  In contrast, Rowell's sales from the time of his arrival in Atlanta until his resignation were the lowest among all of his peers.  [Doc. 45-4 at 2 ¶¶ 6-8, 3-4 ¶¶ 13-14].  Rowell further acknowledges that he has "no way to prove" that any differences in the assignments given to Blackburn and himself were based on race, apart from the sole fact that Rowell received different work assignments than Blackburn.  [Doc. 48 at 106].  See also [id. at 14-19, 74-77, 82, 85-86 (outlining plaintiff's work assignments, which he termed his "African-American responsibilities")].  Rowell even described the comparison between himself and Blackburn as "[a]pples and oranges."  [Id. at 100]; see also Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (citations omitted) (in determining whether employees are similarly situated comparators for purposes of establishing a prima facie case of race discrimination, apples should not be confused with oranges, but should instead be compared to apples).  Accordingly, the Court finds Rowell's assertion that Blackburn was a similarly situated comparator to be entirely without merit, and the Court will thus limit its discussion of disparate treatment to the remaining three comparators named by plaintiff.

assigned to them.  [Id. at 59-60, 65].[19]  Metlife argues in its motion for summary judgment that Rowell has failed to establish disparate treatment because "there were important and material differences" between Rowell and each of the named comparators.  [Doc. 45-5 at 9-11].

The Court finds that Rowell and his co-workers were not similarly situated comparators "in all relevant respects."  Specifically, Rowell was differently situated from his peers with respect to job performance, experience, and customer feedback. First, with respect to job performance, the record evinces a considerable disparity between the level of Rowell's overall performance and that of his peers.  Not only did Rowell fall short of his 2009 and 2010 sales goals by a greater margin than any of his co-workers, but his total sales volume for those years was also the lowest among them.   In 2009, Rowell achieved only 10.6 percent of his annual sales objective.  [Doc. 45-2 at 2 ¶ 8; Doc. 45-4 at 2 ¶ 6; Doc. 48 at 182, 184].  In contrast,

---

[19] Rowell's testimony concerning the exact nature of the "opportunities" of which he was allegedly deprived on a racial basis is both confusing and inconsistent. Compare [Doc. 48 at 65 (alleging that Metlife excluded him from employment opportunities by assigning him less clients, brokers, and consultants in general, rather than by not assigning him particular clients, brokers, and consultants)], with [id. at 62-64, 108-09 (suggesting that it is not only the number of brokers assigned that is determinative of opportunity, but rather the "combination" of their quantity and quality, with quality being how many clients a specific broker has and the size of those clients], and [id. at 63 (testifying in vague terms that his repeated references to the various "opportunities" given to his peers at his expense meant simply "the opportunity in general")].

Ryan reached 64.8 percent of his 2009 sales goal, while Vietri attained 29.8 percent of his 2009 sales goal.  [Doc. 45-4 at 2 ¶¶ 6, 8; Doc. 45-2 at 2 ¶ 8; Doc. 48 at 182, 184].[20] Further, in 2009, Rowell's actual sales totaled $689,565.00, while Ryan made sales totaling $4,943,371.00, and Vietri achieved total sales of $1,339,500.00, during the same year.  [Doc. 45-2 at 2 ¶ 8; Doc. 45-4 at 2 ¶ 6; Doc. 48 at 182, 184].

By February of 2010, Rowell had achieved only 6 percent of his 2010 sales goal, at the same time that Ryan, Vietri, and Leweling had reached 38 percent, 33.5 percent, and 47.9 percent of their 2010 sales objectives, respectively.  [Doc. 45-4 at 3-4 ¶¶ 14-15].  Moreover, Rowell's total sales as of February 2010 were less than $300,000.00.  [Doc. 45-2 at 4 ¶ 19; Doc. 45-4 at 3 ¶ 13].  Conversely, as of the same date, Ryan's total sales were $2,417,708.00, and Vietri's were $2,032,365.00–each more than seven times greater than Rowell's.  Leweling's sales as of February 2010 were also substantially higher than Rowell's, totaling $962,720.00.  [Doc. 45-4 at 3-4].  Indeed, Rowell admits that he was the only one out of the named comparators to have achieved 10 percent or less of their 2009 sales goal, and to have achieved  6 percent or less of their 2010 sales goals by February 2010.   [Doc. 48 at 121].  Considering that Rowell's employer was primarily engaged in the business of sales, see [Doc. 45-2 at 1 ¶ 3], the sharp divergence of Rowell's sales performance in

---

[20] Leweling was hired on Dec. 1, 2009, [Doc. 45-4 at 4 ¶ 15], and so she may not serve as Rowell's comparator during the year of 2009.

relation to his peers is a highly relevant respect in which Rowell and his comparators were not similarly situated.  See Phillips, 262 F. App'x at 208.  See also [Doc. 48 at 181 (plaintiff admitting that sales were a "huge part of [his] job as a client executive and an account executive," since, absent sales or profitable renewal with existing members, Metlife earns no revenue)].   Thus, neither the quantity (total sales) nor the quality (performance measured by sales objective) of any of plaintiff's comparators' circumstances may be said to have been "'nearly identical' to those of [] plaintiff."  See Shineski, 2012 WL 664277, at *3 (citations omitted).

Additionally, during the 2009 sales period, several customers assigned to Rowell cancelled their existing plans with Metlife, resulting in a total loss of more than $3,000,000.00, [Doc. 45-2 at 2 ¶ 9; Doc. 45-4 at 2 ¶ 7], and there is no evidence of record establishing any similar losses–or even any losses at all–derived from cancellations by clients assigned to Rowell's comparators.  Even accepting Rowell's contention that his "opportunities," however defined, were somehow "less" than those of his peers, he has failed to show that any such disparity was not attributable to his own refusal of the additional sales opportunities offered to him by Trinkwon in 2009.  See [Doc. 45-2 at 2 ¶ 10; Doc. 48 at 148].  See also Knight, 330 F.3d at 1316-19 (affirming summary judgment for employer where the record showed that comparator's performance history was "substantially better" than plaintiff's);

Johnson v. Miller Brewing Co., 341 F. App'x 477, 479 (11th Cir. 2009) (per curiam) (unpublished) (citations omitted) (comparators were not similarly situated where plaintiff was "the worst performer" among them and failed to "consider[] the degree of failure that separated him from the rest").

The relevant work experience of Rowell's coworkers further indicates that they were not similarly situated comparators. Rowell was hired by Metlife in 2002, promoted to Account Executive several years later,[21] and transferred to Metlife's Atlanta office in the summer of 2008. [Doc. 48 at 267-68; Doc. 45-4 at 1 ¶ 3, 2 ¶ 5]. Ryan and Vietri were already working in the Atlanta office at the time of Rowell's transfer, [Doc. 48 at 65-66], and Vietri had just begun working as an Account Executive in 2008, [Doc. 45-4 at 2 ¶ 9]. Despite his relative inexperience, by February of 2010, Vietri's 2010 sales were already significantly higher than his total sales in 2009, compare [Doc. 45-4 at 2 ¶ 8 ($1,339,500 in 2009 sales)], with [id. at 4 ¶ 14 ($2,032,365 in sales by February, 2010)]. In contrast, Rowell's 2010 sales by February of 2010 were several times lower than his total sales the prior year, compare [id. at 2 ¶ 6; Doc. 45-2 at 2 ¶ 8 ($689,565 in 2009 sales)], with [Doc. 45-2 at 4 ¶ 19 ($262,100 in sales by February, 2010)]. See also [Doc. 45-5 at 12 (Vietri, a "relatively junior employee" whose sales through February of 2010 were "nearly double" his 2009

---

[21] Rowell estimates that he was promoted to Account Executive in September, 2006. [Doc. 48 at 264].

sales, "was trending upward," while plaintiff "had been working in the industry for nearly a decade and his results were trending downward in 2010.")].  In addition, Leweling had already achieved nearly 48 percent of her 2010 sales goal by February of 2010, in marked contrast to Rowell's achievement of only 6 percent of his sales goal by the same time, even though she was hired just several months prior, and 2010 was her first full year as an Account Executive.  [Doc. 45-4 at 3-4 ¶¶ 14-15].  See also Bio v. Fed. Express Corp., 424 F.3d 593, 597 (7th Cir. 2005) (citations omitted) ("substantial gap in experience" precluded a finding that comparators were similarly situated).

Rowell differed from his coworkers in still another respect because he received negative feedback on Metlife's NSC surveys, and several of Metlife's customers complained about his performance in a variety of areas.  See [Doc. 45-2 at 2-3 ¶¶ 11-13 ("[Plaintiff's] customers complained of his lack of product and process knowledge, his struggle with internal relationships, his deficient listening and organizational skills, and his need to improve his partnerships and work more effectively with his brokers.")].  Some clients specifically indicated that they did not wish to work with Rowell any longer.  See [Doc. 48-9 at 5-6; Doc. 48-20 at 3-5; Doc. 48 at 185-86, 307-08; Doc. 45-4 at 2 ¶¶ 10-11; Doc. 45-2 at 2-3 ¶¶ 11-13].  On the other hand, there is no evidence that Ryan, Vietri, or Leweling received negative feedback

of any kind, or that any of Metlife's customers complained about them or otherwise expressed a desire not to work with them in the future.  See Richardson v. Ala. Pine Pulp Co., 277 F. App'x 907, 909 (11th Cir. 2008) (per curiam) (unpublished) (affirming summary judgment for employer where plaintiff, unlike comparator, was the subject of a customer complaint that cost his employer a substantial sum of money).

Therefore, "[plaintiff] has failed to meet [his] burden of producing evidence of a comparator who was . . . afforded more favorable treatment," nor has he "direct[ed] the Court to any other circumstantial evidence suggesting that race . . . discrimination played a role in [the challenged employment actions]."  Seldon v. Total Sys. Servs., Inc., 653 F. Supp. 2d 1349, 1372 (M.D. Ga. Aug. 6, 2009) (citations omitted); see also Thomas v. Humana Health Plan, Inc., 457 F. App'x 819, 821-22 (11th Cir. 2012) (per curiam) (unpublished); Hooks v . Ga. Dept. of Corr., 311 F. App'x 295, 297-98 (11th Cir. 2009) (per curiam) (unpublished).  Accordingly, because Rowell has failed to identify a valid comparator from outside his protected class who was treated more favorably than he was, he has failed to establish a prima facie case of racial discrimination, and it is **RECOMMENDED** that Metlife's motion for summary judgment be **GRANTED**.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004) (emphasis and citations omitted) ("If a plaintiff fails to

show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present."). <u>See also</u> <u>Brown v. Jacobs Eng'g, Inc.</u>, 401 F. App'x 478, 480 (11th Cir. 2010) (per curiam) (unpublished); <u>Alansari v. Tropic Star Seafood Inc.</u>, 388 F. App'x 902, 904 (11th Cir. 2010) (per curiam) (unpublished); <u>Howell v. Douglas Cnty. Sch. Dist.</u>, Civil Action File No. 1:07-CV-1873-TWT, 2009 WL 196084, at *11 (N.D. Ga. Jan. 23, 2009), adopted at *1 (granting summary judgment on plaintiff's claim where he failed to point to any similarly situated comparator).

##  2.   <u>Legitimate, Non-Discriminatory Reasons and Pretext</u>

Even if Rowell could establish a prima facie case of race discrimination, Metlife would still be entitled to summary judgment because he has failed to show that the reasons proffered by Metlife concerning the challenged employment actions were prextextual.  In response to Rowell's assertion that Metlife issued him a "pretextual PIP," [Doc. 1 at 3, 14 ¶ 23, 16 ¶ 27], Metlife offers the following legitimate, non-discriminatory reasons for placing Rowell on the PIP:

- Rowell missed his 2009 sales goal by 90 percent

- Rowell was on pace to miss his 2010 sales goal by 94 percent

- Rowell had been the subject of numerous customer complaints

34

[Doc. 45-5 at 8].  See also [Doc. 49-9 at 1 (introduction to PIP informing plaintiff that "you missed your annual sales goals for 2009 and are on pace to miss for 2010 and are not satisfying performance expectations as [] an Account Executive. . . . Given your ongoing substandard levels of performance, you are being placed on a [PIP] effective (2/23/10)"].

Since these explanations constitute legitimate, non-discriminatory reasons for the alleged employment decisions at issue, see Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1236 (11th Cir. 2004); Cooper v. S. Co., 390 F.3d 695, 740 (11th Cir. 2004) overruled on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (performance issues constitute a legitimate non-discriminatory reason to take an adverse action), the onus is on Rowell to prove by a preponderance of the evidence that the reasons provided by Metlife are a pretext for prohibited, discriminatory conduct, see Edmond, 441 F. App'x  at 724-25; Tiggs-Vaughn v. Tuscaloosa Hous. Auth., 385 F. App'x 919, 923 (11th Cir. 2010) (per curiam) (unpublished).  To demonstrate pretext, a plaintiff's evidence must reveal "'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'"  Maples v. UHS of Ga., Inc., 716 F. Supp. 2d 1266, 1274 (N.D. Ga. 2010) (quoting Combs, 106 F.3d at 1538).

Rowell may demonstrate pretext by "either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." Wilson, 376 F.3d at 1088; see also Shuford v. City of Montgomery, Civil Action No. 2:10cv203–WHA–WC (WO), 2011 WL 1375297, at *5 (M.D. Ala. Apr. 12, 2011). Thus, Rowell may create an issue of fact at the pretext stage by (1) presenting evidence that Metlife's proffered reason is not worthy of belief, thereby enabling the jury to infer that discrimination was its real reason, or (2) presenting evidence that discrimination was, in fact, Metlife's real reason. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

"Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." Tolley v. United Parcel Serv., No. Civ.A.1:05CV606TWT, 2006 WL 486523, at *5 (N.D. Ga. Feb. 27, 2006) (citation and internal marks omitted). "Thus, the inquiry is limited to whether the employer offered an honest, nondiscriminatory explanation for [the adverse action], regardless of whether the decision might have been mistaken." Id. (citations omitted). "Ultimately, an employee must meet the employer's stated reason 'head

on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason.'" <u>Young</u>, 432 F. App'x at 917 (alteration in original) (citation omitted). Rowell "cannot establish pretext by simply demonstrating facts that suggest [discriminatory] animus, but must specifically respond to each of the employer's explanations and rebut them." <u>Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec.</u>, 410 F. App'x 243, 247 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). "If the plaintiff fails to demonstrate that there is a genuine issue of material fact concerning whether the employer's articulated reasons for the adverse employment action are pretextual, then the employer is entitled to summary judgment on the [discrimination] claim." <u>Johnson v. Advertiser Co.</u>, 778 F. Supp. 2d 1270, 1277 (M.D. Ala. 2011) (<u>citing</u> <u>Combs</u>, 106 F.3d at 1528).

Rowell asserts in conclusory fashion that Metlife issued a "pretextual PIP," <u>see</u> [Doc. 1 at 3, 14 ¶ 23, 16 ¶ 27], but he fails to cite to any specific evidence of record showing that any of the reasons offered by Metlife for placing him on the PIP were pretextual. As a preliminary matter, Rowell's "conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination," <u>Carter v. City of Miami</u>, 870 F.2d 578, 585 (11th Cir. 1989) (citation and internal marks omitted), and "[t]his Court need not cull through the materials submitted by [plaintiff] searching for evidence which creates a

disputed issue where [plaintiff] has provided no direction," Maitland v. Employease, Inc., No. Civ.A. 1:05-CV-0661-, 2006 WL 3090120, at *12 (N.D. Ga. Oct. 13, 2006), adopted at *1. Nevertheless, the Court will consider certain comments referenced by Rowell in his deposition, which he appears to allege are evidence of pretext. See [Doc. 47 at 5 (plaintiff's response alleging that certain "isolated comments," of his employer, while admittedly "abstract," "trend toward discrimination" when they are "coupled with [his] race[-]determined assignments")].[22] Specifically, Rowell points to three such comments, all allegedly made by Trinkwon, who also was responsible for placing him on the PIP:

- Trinkwon's comment to Rowell that he could use "some diversity" on his staff, made during his interview with Trinkwon regarding Rowell's transfer to Metlife's Atlanta office.

- Trinkwon's comment to Linda Mercer ("Mercer"), a regional sales specialist in Atlanta, made after hiring Rowell, that "he had just hired somebody from Morehouse."[23]

---

[22] To the extent Rowell additionally relies on comparator evidence to show pretext, see Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1563 n.20 (11th Cir. 1987) (observing that comparator evidence may be used as evidence of pretext), such evidence is of no avail, because he has failed to establish that any of his co-workers were similarly situated comparators, see discussion, supra at 25-34.

[23] Rowell alleges that this comment made "race an issue" in that it gave Mercer "the impression that [Trinkwon] was referencing the fact that [plainitff] was African-American." [Doc. 48 at 124-125].

- Trinkwon's comment to Rowell that "he [Trinkwon] saw an attractive African-American woman in the building and [his suggestion] that [Rowell] should approach her."

[Id. at 32, 122-28, 177].

Metlife argues that "these statements . . . are too vague and ambiguous to show that Trinkwon was biased against African Americans," and that, in any case, "they are 'stray remarks' that do not advance [plaintiff's] discrimination claim," as they "are not related to Trinkwon's decision to place [plaintiff] on a PIP, and [] are remote in time from this 2010 action." [Doc. 45-5 at 9-10]. The Court is persuaded that the comments referenced by Rowell are simply too equivocal and too far removed from any alleged adverse action to support a reasonable inference of racial discrimination. Indeed, as Metlife points out, Trinkwon's comment that he could use "some diversity" on his staff does not evidence racial animus, and to the contrary, could reasonably be considered as "laud[ing] the importance of diversity." [Id. at 9]. At the very least, "[w]ith regard to the [] words spoken by [Trinkwon], there is nothing in them which would allow a reasonable factfinder to conclude that [Trinkwon] was motivated by racial . . . animus when [he] used them." See Atkins v. Astrue, Civil Action File No. 1:07-CV-1180-TWT, 2007 WL 4373598, at *8 (N.D. Ga. Dec. 5, 2007), adopted at * 1.

Further, Trinkwon's remarks are too far removed in time from his issuance of the PIP to "indicate that the employment decision in question was motivated by race." Darity v. MEGA Life & Health Ins. Co., 541 F. Supp. 2d 1360, 1370 (N.D. Ga. 2008) (internal marks omitted) (quoting Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11thCir. 2002). The first two comments were made before Rowell even began working at Metlife's Atlanta office, [Doc. 48 at 123-26], and Rowell testified that the third comment was probably made in the "first quarter" of 2009, [id. at 124], at least ten months before Rowell's placement on the PIP in February of 2010, see [Doc. 45-4 at 4 ¶ 16; Doc. 45-2 at 4 ¶ 20]. As a consequence, "there is no direct link" between Trinkwon's alleged comments and his decision to place Rowell on the PIP. Darity, 541 F. Supp. 2d at 1370. Indeed, the first two of Trinkwon's statements, taken in context, are not even remotely associated with Trikwon's later decision to place Rowell on the PIP, but with his successful transfer to Metlife's Atlanta office–hardly an adverse employment action. See Standard, 161 F.3d at 1330) (citation omitted) ("[R]emarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.").

Accordingly, Rowell has failed to offer "sufficient evidence to create a genuine issue of material fact regarding whether . . . [Metlife's] . . . articulated reasons [are] pretextual," Dockery, 170 F. App'x at 65-66, and has therefore failed to make a

"showing sufficient to establish the existence of an element essential to [his] case," Celotex Corp., 477 U.S. at 322.[24] See also Tolley, 2006 WL 486523, at *4 (citing Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990); Young v. Gen. Foods Corp., 840 F.2d 825, 829 (11th Cir.1988)) ("The failure to present significantly probative and concrete evidence of pretext justifies summary judgment for the defendant.").

Finally, to the extent Rowell's contention that the PIP was "false," see [Doc. 1 at 16 ¶ 28]; see also [id. at 3 (PIP was "bogus"); Doc. 48 at 187 (PIP was "false" because it indicated that plaintiff's performance was substandard)], amounts to an assertion that Trinkwon exercised poor judgment by placing him on the PIP, Rowell "cannot succeed by simply quarreling with the wisdom of [Trinkwon's decision]," Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir.2000) (citations omitted); see also Alexander v. Fulton Cnty., Ga., 207 F.3d 1303, 1341 (11th Cir. 2000), overruled on other grounds by Manders v. Lee, 338 F.3d 1304 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); Kim-Foraker v. Allstate Ins. Co., 834 F. Supp.

---

[24] Rowell's bald assertions that Trinkwon's comments "singled out" race, see [Doc. 48 at 122-28], are unsupported and conclusory–as well as ambiguous–and likewise fail to create any genuine issue with regard to pretext. See Burgos-Stefanelli, 410 F. App'x at 247; Odum v. Gov't Emps. Ins. Co., 405 F. App'x 396, 396 (11th Cir. 2010) (per curiam) (unpublished); Jenkins v. J.C. Penny, Inc., Civil Action No. CV107-034, 2009 WL 2524499, at *3 (S.D. Ga. Aug. 17, 2009).

41

2d 267, 281 (E.D. Pa. 2011) (second alteration in original) (citation and internal marks omitted) ("[t]o discredit the employer's proffered reason . . . [plaintiff] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").  Indeed, Rowell's allegations that the PIP was "false" and "pretextual" are particularly unpersuasive in light of his own admission that his performance in 2010 was "poor," [Doc. 48 at 183], and that Trinkwon ultimately placed him on the PIP because of his performance in relation to his sales goals for 2009 and 2010, [id. at 122]. Accordingly, it is hereby **RECOMMENDED** that Metlife's motion for summary judgment be **GRANTED** as to Rowell's race discrimination claims.

## B.    Harassment / Hostile Work Environment Claim

Rowell asserts that he was subjected to a "hostile work environment . . . because of his race," [Doc. 1 at 3]; see also [id. at 15 ¶ 24, 18 ¶ 33], in that he "was the target of unwelcome [race-based] comments and assignments," [Doc. 47 at 7]. Specifically, Rowell alleges that he encountered a hostile work environment upon his return from disability leave in January of 2010 because "everybody was looking at [him] differently."  [Doc. 48 at 212].  Rowell asserts that he was looked at differently by his coworkers because Trinkwon had informed them that customers

had complained about him, [id. at 210-12], and because he had been away for about four months.  Rowell further asserts that he was "talked about behind his back," and that there "were a lot of questions about what [his] assignment was," including one coworker's inquiry whether he had received his assignment because he was black. [Id. at 209-16, 254-57, 125-26, 170].[25]  Metlife argues that Rowell's hostile work environment claim fails as a matter of law because the conduct alleged by plaintiff in support of his claim was not based on Rowell's race and was not sufficiently severe or pervasive to state a claim for hostile work environment under Title VII. [Doc. 45-5 at 14-16].

In order to state a prima facie case of a hostile work environment based on race, Rowell must show: (1) that he belongs to a protected group, (2) that he was subjected to unwelcome racial harassment, (3) that the harassment was based on his race, (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) that there is a basis for holding Metlife liable.  See Harper v. ULTA Salon Cosmetics & Fragrance, Inc., Civil Action File No. 1:05-CV-1285-TWT, 2007 WL 528088, at *25 (N.D. Ga. Feb. 13, 2007), adopted at *1 (citations omitted).

_____

[25] Rowell also contends that he was "targeted in meetings" upon his return from disability leave, [Doc. 47 at 7], in that Trinkwon asked him the "hardest questions" at meetings and "did not care what [plaintiff] said," [Doc. 48 at 171-73].

Also, "[t]he elements of a racially hostile work environment claim are the same, regardless of whether the claim is viewed through the lens of Title VII or § 1981." Moore v. Jimmy Dean/Sara Lee Foods, Inc., 520 F. Supp. 2d 1359, 1369 (N.D. Ala. 2007) (citations omitted).

"The fourth element requiring that the harassment be sufficiently severe or pervasive contains both subjective and objective components. To be actionable, the harassment must result in both an environment that a reasonable person would find hostile or abusive and an environment that the plaintiff subjectively perceived to be abusive." Edmond, 441 F. App'x at 724 (citing Bryant v. Jones, 575 F.3d 1281, 1296, 1297 (11th Cir. 2009)). In sum, to prove his claim, Rowell must demonstrate that his work environment was "permeated with discriminatory intimidation, ridicule, and insult," that was "sufficiently severe or pervasive" to have altered the terms, conditions, or privileges of [his] employment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation and internal marks omitted); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Gupta, 212 F.3d at 582-83. That is, Rowell must prove that, among other things, he was harassed because of his race and that the harassment affected the terms, conditions, or privileges of his employment. Miller, 277 F.3d at 1275.

Rowell has failed to produce evidence sufficient to establish a prima facie case because he has not shown that any harassment he experienced was based on his race or that it was sufficiently severe or pervasive to alter the terms and conditions of his employment, nor has he shown any basis for holding Metlife liable.  In fact, Rowell admits that he was not looked at differently on account of his race, but rather on the basis of his coworkers' alleged knowledge that customers had complained about him, and, more generally, simply because he had been away from work on disability leave for about a third of the year.  [Doc. 48 at 211-13].

With respect to the customer complaints of which Trinkwon allegedly informed Rowell's coworkers, plaintiff concedes that he has "no evidence" to show that these complaints were fabricated or that Trinkwon disclosed them in order to cause Rowell emotional distress.  [Id. at 257, 306].  The facts alleged by Rowell fall far short of establishing that a reasonable person in his circumstances would have perceived his work environment as so "permeated with discriminatory intimidation, ridicule, and insult," as to alter the terms or conditions of his employment.  See Harris, 510 U.S. at 21.  Indeed, "[t]he Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment," Dexter v. Amedisys Home Health, Inc., No. 6:11-CV-4019-LSC, 2013

WL 4045811, at *6 (N.D. Ala. Aug. 7, 2013) (footnote and citations omitted), and Rowell admits that he was not the subject of any racial slurs and that there was nothing racially demeaning about his work environment, [Doc. 48 at 215-17, 257].

Rowell alleges that his coworkers "talked . . . behind his back" when he returned from disability leave, [Doc. 47 at 7], but such ordinary workplace discussion, even if Rowell perceived it as offensive, is not actionable under Title VII, see Williams v. Ruskin Co., No. 1:10-cv-508-WC, 2012 WL 692964, at *14 (M.D. Ala. Mar. 1, 2012) (citations omitted) (fact that plaintiff based his hostile work environment claim in part on "comments and incidents he heard second-hand through his co-workers," but did not "experience[] []or witness[] directly . . . , weaken[ed] the severity of his allegations"). See also Mason v. S. Ill. Univ. at Carbondale, 233 F.3d 1036, 1047 n.9 (7th Cir. 2000) (citations omitted) ("'[T]hrough the grapevine' or 'second-hand' conduct is not sufficiently severe or pervasive so as to create a hostile work environment."). Neither has Rowell pointed to any facts suggesting that these comments were made in a threatening or humiliating manner. See Gupta, 212 F.3d at 582-83.

Indeed, far from depicting an "atmosphere charged with racial hostility," Edwards v. Wallace Cmty. College, 49 F.3d 1517, 1521 (11th Cir. 1995) (citation and internal marks omitted), the conduct alleged by Rowell in support of his claim of

hostile work environment appears to be nothing other than the "ordinary tribulations of the workplace" that are not actionable under Title VII, <u>Gupta</u>, 212 F.3d at 583.  Accordingly, Rowell has failed to establish a prima facie case of hostile work environment, and it is hereby **RECOMMENDED** that Metlife's motion for summary judgment be **GRANTED** as to this claim.[26]  <u>See</u> <u>Davis</u>, 245 F.3d at 1242 (citations and internal marks omitted) (observing that plaintiff's loss of self-esteem and prestige in the eyes of others who came to be aware of criticism and negative

---

[26] Rowell does not specifically plead a count of constructive discharge in violation of Title VII, <u>see</u> [Doc. 1], though his complaint contains several scattered allegations that he was "constructively terminated," <u>see</u> [<u>id.</u> at 2, 3, 16, 20]; <u>see also</u> [Doc. 48 at 129, 156, 170-72].  Specifically, Rowell contends that Metlife "constructively terminat[ed] [him] by placing [him] on a false PIP and assigning him a sales goal which was unrealistic and unattainable[.]"  [Doc. 1 at 16-17 ¶ 28].  <u>But see</u> [Doc. 48 at 150-51 (plaintiff admitting that his "job was threatened" not because of his race, but because he turned down the additional opportunities offered by Trinkwon)]. Nevertheless, to the extent Rowell claims constructive discharge, that claim fails as a matter of law since he has failed to establish a prima facie case for hostile work environment, and, as Metlife correctly points, the "standard for constructive discharge is even higher than the standard for hostile work environment," and is therefore "one which [plaintiff] cannot possibly meet."  [Doc. 45-5 at 16, n.3].  <u>See also</u> <u>Fitz v. Pugmire Lincoln-Mercury, Inc.</u>, 348 F.3d 974, 977 (11th Cir. 2003) (alteration in original) (citation omitted) ("A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'"); <u>Hipp v. Liberty Nat'l Life Ins. Co.</u>, 252 F.3d 1208, 1231 (11th Cir. 2001) (per curiam) (threshold for constructive discharge "is quite high"); <u>Williams v. Russell Corp.</u>, 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002) (alteration in original) (internal marks and citation omitted) ("[D]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.").

evaluation concerning plaintiff were insufficient to state a claim under Title VII, "the protections of [which] simply do not extend to everything that makes an employee unhappy.").

## C.   State Law Claims

Rowell has brought state law claims of IIED and negligent retention on which Metlife also seeks summary judgment. See [Doc. 1 at 18-20 ¶¶ 38-49].  Although the Court could decline to exercise supplemental jurisdiction over plaintiff's state law claims, Ingram v. Sch. Bd. of Miami-Dade Cnty., 167 F. App'x 107, 108 (11th Cir. 2006) (per curiam) (unpublished), it is **RECOMMENDED** that summary judgment be **GRANTED** as to Rowell's state law claims of IIED and negligent retention.

### 1.   IIED Claim

Rowell asserts that Metlife is liable for IIED for placing him on a "fabricated PIP and then using that fabricated process as a basis for constructively terminating [p]laintiff's employment," and for "subjecting [p]laintiff to a[] . . . racially hostile and demeaning work environment," which caused Rowell to suffer severe emotional distress.  [Doc. 1 at 19-20 ¶¶ 45-49].  Metlife argues that the conduct alleged by Rowell in support of his claim is not sufficiently extreme or outrageous to constitute IIED under Georiga law.  [Doc. 45-5 at 18-19].

To prevail on an IIED claim under Georgia law, Rowell must show that (1) the conduct was extreme and outrageous; (2) Metlife acted recklessly or intentionally; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. Trimble v. Circuit City Stores, Inc., 469 S.E.2d 776, 778 (Ga. App. 1996); Bridges v. Winn-Dixie Atlanta, Inc., 335 S.E.2d 445, 447-48 (Ga. Ct. App. 1985). See also Soloski v. Adams, 600 F. Supp. 2d 1276, 1371 (N.D. Ga. 2009), adopted in part at 1322. "The burden that a plaintiff must meet in order to prevail on this claim is a stringent one." Soloski, 600 F. Supp. 2d at 1371 (citation omitted).

To be actionable, Metlife's conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Kaiser v. Tara Ford, Inc., 546 S.E.2d 861, 868 (Ga. Ct. App. 2001) (internal marks omitted). "[T]he conduct must be of such serious import as to naturally give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress." Pierri v. Cingular Wireless, LLC, 397 F. Supp. 2d 1364, 1381 (N.D. Ga. 2005), adopted at 1368 (internal marks and citation omitted). While "[t]he existence of a special relationship between the actor and victim, such as that of employer to employee, may make otherwise non-egregious conduct outrageous,'" Georgia courts have noted that "[i]n the employment context . . . a *major outrage* in the . . . conduct

complained of is essential to the tort of intentional infliction of emotional distress."
Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1331 (N.D. Ga. 2009)
(alteration in original) (emphasis added) (internal marks omitted) (quoting Trimble,
469 S.E.2d at 778; MARTA v. Mosley, 634 S.E.2d 466, 470 (2006)).  Whether a claim
rises to the requisite level of outrageousness and egregiousness is a question of law
to be determined by the court.  See Cook v. Covington Credit of Ga., Inc., 660 S.E.2d
855, 858 (Ga. Ct. App. 2008) (citation omitted).

Rowell has not produced sufficient evidence in support of his IIED claim to
defeat Metlife's motion for summary judgment.  First, the actions alleged by Rowell
in the context of an employer-employee relationship, do not constitute a "major
outrage," Anderson, 678 F. Supp. 2d at 1331, nor do they otherwise rise to the level
of "extreme or outrageous" conduct as defined under Georgia law, see Spence v.
Panasonic Copier Co., 46 F. Supp. 2d 1340, 1350-51 (N.D. Ga. 1999) (applying
Georgia law and finding supervisor's conduct not extreme and outrageous where
he screamed at and insulted plaintiff); Fox v. Ravinia Club, Inc., 414 S.E.2d 243, 244-
45 (Ga. Ct. App. 1991) (internal marks omitted) (finding no outrageous conduct
where plaintiff's supervisor spoke to her in a "hostile, intimidating and abusive
manner" and gave false reasons for her termination).

In addition, "[i]n Georgia, disadvantageous employment actions standing alone cannot serve as the basis for the tort of intentional infliction of emotional distress," Wilson v. Ga.-Pac. Corp., 4 F. Supp. 2d 1164, 1168 (N.D. Ga. 1998) (citation omitted), and "[e]mployment related activities by themselves are insufficient to establish that conduct is extreme and outrageous," Anderson, 678 F. Supp. 2d at 1331 (citations omitted).  Rowell's IIED claim is predicated on the same set of facts surrounding his employment with Metlife as his race discrimination claims.  Indeed, Rowell's IIED claim appears to be nothing more than an alternative theory of recovery for emotional damages, based on the identical facts giving rise to his failed claims of racial discrimination, hostile work environment and, to the extent he has plead it, constructive discharge.[27]

Further, Rowell cannot survive summary judgment where he has produced no evidence demonstrating that he suffered severe emotional distress as a result of Metlife's actions aside from his own bare allegations.  See Pierri, 397 F. Supp. 2d at 1382; Quarles v. McDuffie Cnty., 949 F. Supp. 846, 855-56 (S.D. Ga. 1996) (granting summary judgment where plaintiff produced no evidence beyond her own

---

[27] Compare [Doc. 1 at 15-18 ¶¶ 26-37 (alleging racial discrimination and hostile work environment because Metlife "constructively terminat[ed] [plaintiff] by placing [him] on a false PIP")], with [id. at 19-20 ¶¶ 44-49 (alleging IIED because Metlife issued a "fabricated PIP [thereby] constructively terminating [p]laintiff's employment," and by creating a "racially hostile . . . work environment")].

assertions to support her claim that she had suffered severe emotional distress).

Indeed, the only facts that Rowell alleges to establish his severe emotional distress

is loss of income due to his allegedly diminished "opportunities" with Metlife, and

accompanying "night sweats" and "worsening" loss of hair. See [Doc. 48 at 239-42,

260-61].[28]  Rowell, however, "has failed to provide any corroborating evidence to

support his position," that these complaints constitute severe emotional distress, as

the only evidence submitted by Rowell on this issue is his own deposition

testimony, which is insufficient to create a triable issue of fact.  Gomes v. Cal. Dept.

of Corr., No. C97-1072 MJJ, 1998 WL 556578, at *3 (N.D. Cal. Aug. 31, 1998 (citation

omitted); see also Baker v. Bank of Nova Scotia, No. 1:04-CV-0660-RLV, 2006 WL

618413, at *17 (N.D. Ga. Mar. 8, 2006), adopted in part at *2 (citation and internal

marks omitted) ("[M]ere conclusory, uncorroborated allegations by a plaintiff in an

affidavit or deposition will not create an issue of fact for trial sufficient to defeat a

well-supported motion for summary judgment."); Tidwell-Williams v. Nw. Ga.

Health Sys., Inc., No. 1:97–CV–1726A–JEC, 1998 WL 1674745, at *6 (N.D. Ga. Nov.

19, 1998) (citations omitted) ("It is well settled that self-serving, conclusory affidavits

---

[28] Rowell also testified that he visited a doctor on one occasion, where he received "negative results" for his stress-related complaints.  [Doc. 48 at 236-38, 254; Doc. 49 at 402].

submitted by a nonmoving party in opposition to a motion for summary judgment will not create an issue of fact for trial.").[29]

As Rowell has pointed to no additional record evidence, besides the same employment-related conduct that also serves as the basis of his race discrimination and hostile work environment claims, see Wilson, 4 F. Supp. 2d at1168, and, since Rowell concedes that he has "no evidence" to show that any of the various customer complaints about him were fabricated or that Trinkwon intentionally disclosed them in order to cause him emotional distress, [Doc. 48 at 257, 306], the Court finds that Rowell's IIED claim fails as a matter of law, and that summary judgment for Metlife on this claim is warranted, see Gathright-Dietrich v. Atlanta Landmarks, Inc., No. Civ.A. 1:02-CV-1978, 2003 WL 1964799, at *2 (N.D. Ga. Apr. 22, 2003) (citation omitted) ("Discriminatory conduct, standing alone, is not sufficient to sustain a claim for [IIED]."); Farrior v. H.J. Russell & Co., 45 F. Supp. 2d 1358, 1364 (N.D. Ga. 1999) ("While illegal discrimination-if proved-may provide federal remedies, Georgia law offers no relief for discriminatory termination through this particular tort."). It is therefore **RECOMMENDED** that Metlife's motion for summary judgment be **GRANTED** as to Rowell's IIED claim.

---

[29] It also appears doubtful that Rowell could establish the element of causation for his IIED claim, as he concedes that his work with Metlife was "stressful from the time [he] started until the time [he] resigned," and that his new employment with a different company continues to be stressful for him. [Doc. 48 at 254].

## 2.   **Negligent Retention**

In count four of his complaint, Rowell alleges a claim of "Negligence-Harassment." [Doc. 1 at 18-19 ¶¶ 38-43].   Rowell's claim appears to be one of negligent supervision or retention, as it is predicated on Metlife's allegedly negligent failure to "ensure a work environment free of racial harassment," notwithstanding its alleged knowledge of  "racist misconduct directed at [p]laintiff" by "Trinkwon and its other white employees."  [Id. at 19 ¶¶ 39-40].  Metlife argues that Rowell's claim must fail because "it is derivative of [his] underlying claim of harassment which is itself without merit," and because Rowell's claim is for recovery of emotional damages resulting from negligence, and he has not sustained a physical impact as required by Georgia law to maintain such a claim.  [Doc. 45-5 at 16-18].

Under Georgia law, an employer is "bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency." O.C.G.A. § 34-7-20; see also Tomczyk v. Jocks & Jills Rests., LLC, 198 F. App'x 804, 815 (11th Cir. 2006) (per curiam) (unpublished).  "A claim for negligent hiring, retention, or supervision brought pursuant to Georgia law arises when an employer negligently hires, retains, or supervises an employee and that employee subsequently harms the plaintiff."  Canty v. Fry's Elecs., Inc., 736 F. Supp. 2d 1352, 1379 (N.D. Ga. 2010), adopted at 1364 (citation omitted).

Further, "[a] claim of negligent retention is derivative of an underlying tort claim." Id. (citations omitted); see also Guthrie v. Waffle House, Inc., 460 F. App'x 803, 807 (11th Cir. 2012) (per curiam) (unpublished); Anderson, 678 F. Supp. 2d at 1329. "There is no distinct tort in Georgia law for harassment, retaliation or discrimination," though Georgia courts have recognized that such "conduct may form the basis of [an IIED claim]," Canty, 736 F. Supp. 2d at 1379-80 (citations omitted); see also Hajhossein v. Mayor & City Council of Statesboro, Ga., No. 609CV048, 2010 WL 2179147, at *3 (S.D. Ga. May 28, 2010). As a consequence, "[a] claim for negligent retention is necessarily derivative and can only survive summary judgment to the extent the underlying substantive claims survive the same." Mosley, 634 S.E.2d at 489 (citations omitted). Accordingly, Rowell's negligent retention claim fails as a matter of law because it is derivative of his other claims, which are due to be dismissed on summary judgment. See Grimsley v. Marshalls of MA, Inc., 284 F. App'x 604, 611 (11th Cir. 2008) (per curiam) (unpublished) (where underlying claim could not survive summary judgment, derivative negligent retention and supervision claim also failed as a matter of law); Robinson v. Intercorp, 512 F. Supp. 2d 1307, 1316-17 (N.D. Ga. 2007).

Moreover, "[a] plaintiff in Georgia can only be awarded damages for emotional distress where [he] has proven . . . [that] 'there is some impact on the

plaintiff, and that impact must be a physical injury.'"  Harris v. Fulton-DeKalb Hosp. Auth., 255 F. Supp. 2d 1347, 1378 (N.D. Ga. 2002), aff'd at 48 F. App'x 742 (11th Cir. 2002) (quoting Ryckeley v. Callaway, 412 S.E.2d 826, 826 (Ga. 1992)). "Negligent conduct, without more, will not support a recovery for emotional distress." Mangrum v. Republic Indus., Inc., 260 F. Supp. 2d 1229, 1257 (N.D. Ga. 2003) (citation and internal marks omitted).  Therefore, "[i]n order to prevail on this claim, [plaintiff] must meet the requirements of the Georgia impact rule, which requires that he show that (1) he suffered a physical impact; (2) the physical impact caused him physical injury; and (3) the physical injury caused his mental suffering or emotional distress." Kirkland v. Earth Fare, Inc., 658 S.E.2d 433, 436 (Ga. Ct. App. 2008).  See also Owens v. Gateway Mgmt. Co., 490 S.E.2d 501, 502 (Ga. Ct. App. 1997).

Because Rowell failed to plead any physical impact resulting from Metlife's alleged actions, the Court concludes that summary judgment is appropriate on this ground, as well. See Kirkland, 658 S.E.2d at 436 (granting summary judgment where it was "undisputed that no physical impact occurred between [plaintiff] and any employee of [defendant]; and there [was] no allegation or evidence of any physical

injury").[30]   Accordingly, it is hereby **RECOMMENDED** that summary judgment be

**GRANTED** in favor of Metlife on Rowell's claim of "Negligence-Harassment."

## V.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Metlife's motion for

summary judgment, [Doc. 45 ], be **GRANTED**.

The Clerk is **DIRECTED** to terminate this reference.

**IT IS SO RECOMMENDED** and **DIRECTED**, this 9th day of October, 2013.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[30] To the extent Rowell may seek alternatively to base his negligence claim on "malicious, willful, or wanton" conduct by Metlife's employees, see Guthrie, 460 F. App'x at 808-09 (citing Lee v. State Farm Mut. Ins. Co., 533 S.E.2d 82, 84 & n.2 (Ga. 2000) ("Under Georgia tort law, a claimant cannot recover damages for negligence resulting in an emotional injury unless the claimant suffers a physical impact or provides evidence of 'malicious, willful, or wanton' conduct."), the Court agrees with Metlife that Rowell "cannot possibly show that his coworkers' looking at him differently was 'malicious, willful, or wanton' harassment," since Rowell admitted that he was not treated differently on account of his race, and that he was not the subject of any racial slurs or insults, or other disparaging remarks, [Doc. 45-5 at 17-18 (citations omitted)]; see also [Doc. 48 at 214-15, 257].